Dorothy Buchhagen v. ICF International. Mr. Vano, good to have you here, sir. Thank you, sir. May it please the Court, the employer fired Dr. Dorothy Buchhagen on July 26, 2010, just six days after the employee complained to her employer's HR director that Dr. Deborah Beebe, her supervisor, was discriminating against her based on her age. The Court should reverse the district court because a preponderance of the evidence shows that the employer decided to discharge Dr. Buchhagen after and because she repeatedly complained of age discrimination on the job, because the employer's shifting reasons for the discharge, including post hoc reasons, were pretextual, because the district court erroneously accepted those reasons, though there were definitely genuine issues about these material facts, and because the Court did not specifically address appellant's reprisal claim. It just used the word retaliation one time in its opinion. We asked the Court – Why isn't that good enough? I'm sorry? You call it a reprisal claim. You say the Court called it retaliation. I say, why isn't that good enough? It didn't explain why it denied the claim on retaliation. Term, retaliation and reprisal. It didn't explain why it – Aren't they the same? Of course, they are synonymous. Synonymous. Exactly. They're identical. The Court did not explain, however, why it was dismissing the retaliation slash reprisal claim. That's why we filed the motion with the Court to amend or alter and ask the Court to explain its decision. But the Court denied that motion, too. What is the evidence of retaliation here? The record shows close proximity of the employee's projected activities over a four-month period starting March 26, 2010, and the employer's subsequent harassment of her culminating in the July 26 discharge. It showed the evidence shows – There's a difference between harassment just because two people can't get along and harassment or retaliation under a protected status. And there's a lot of evidence in the record that the employee and her supervisor and others just – they just couldn't get along very well. And there's a lot of complaints about harassment and bad treatment and that sort of thing. But there isn't a whole heck of a lot in there about age. So what's your best evidence that the retaliation was on the basis of age complaint? Okay. On March 26, Your Honor, the employee complained to the Vice President, Matt Perry, about her evaluation by Dr. Beebe. And at that time, she accused Dr. Beebe of playing favorites with younger employees. And she related Dr. Beebe's statement to Dr. Buckhagen, which was applying to work for ICF. No one will hire you at your age. That was the first statement of age discrimination that Dr. Buckhagen made. But Dr. Beebe did hire her. No, Dr. Beebe did not hire her. Matt Perry did. Didn't she hire her initially? She hired her at Lockheed Martin. But it's very, very clear, Your Honor, that the hiring person at – Wasn't she kind of old when she hired her at Lockheed Martin? Oh, yes. Yes, she was. The record is clear. It was Matt Perry who hired Dr. Buckhagen. See Perry's deposition, pages 18 and 19. Strickland said, we hired her, implying that Dr. Beebe did not. Dr. Beebe did not hire Dr. Buckhagen at ICF. But that was pretty soon after she hired her at whatever the other lawyer was, wasn't it? In a few years, a few years. But it's very important to remember, Dr. Beebe was neither the hiring authority at ICF nor the firing authority. Matt Perry, the vice president, was both the hiring authority and the firing authority. It's also very important to understand in this court that the appellees have not contended that there was any kind of good – that there's a lack of good faith, reasonable belief by Dr. Buckhagen about age discrimination, nor have they contended that her actions were unprotected. In fact, they concede at the very least that the last action on July 20 was protected. Their main claim on the proximity is they claim that the decision was made before she complained on July 20. The record doesn't sustain that, however. I'll explain why. For example, right after Dr. Buckhagen complained to Matt Perry that Beebe was doing favors with younger employees, in late March, Laurie O'Neill, an HR official, called the employee a troublemaker. And she asked her if she liked the job and said there's no other place in the company for her. This court recognizes that the term troublemaker is a term employers use to define employees who engage in activities. Well, looking at this record, couldn't it barely be said that she really was a troublemaker? Yes, indeed. And for that reason, a jury could look at the record and say they fired her because she was a troublemaker raising issues about discrimination. On April 19, after this Beebe erupted and when the employee told her that she learned from Perry and others that Beebe had lied to her about the evaluation process, April 20, the employee complained to O'Neill about Beebe's unprofessional behavior, and then Beebe criticizes her for complaining about her. May 5, the employee tries to explain to Ms. O'Neill why she deserves a better rating. O'Neill says there's no other place in the company for you. May 12, at a so-called mediation session with O'Neill, Beebe warns the employee, I'll be monitoring your interactions with others on the contract and with the client and will work up a process. Indeed, she did. The next day, May 13, she initiated a so-called backup system for the employee. No other employees on this contract had a backup system. Dr. Buckhagen realized, as she later called it, it's a replacement system. Look at page 912 of the appendix, part of the July 20 statement that she made to Ms. Strickland. Dr. Buckhagen realized that this is a system for getting people out. When you start giving them backups, it gives the employer someone to fall back upon when they get rid of the employee. There's no evidence that the other employees had backups in this contract. On May 27, after the employee questioned the backup plan, Beebe expressed concern to O'Neill and Perry that the employee may be engaged in a, quote, mutiny, end quote, against the authority. See page 258 of the appendix. On June 3, the employee sends an email to Beebe copying O'Neill, questioning that the backup plan is disparate treatment. But she also says she will follow the procedures. Beebe is admittedly concerned, end quote, about the employee's disparate treatment allegation, but she doesn't respond. O'Neill responds, and she directs Dr. Buckhagen sharply to follow Dr. Beebe's instructions. June 11, we're seeing more disparate treatment allegations now. June 11, the employee sends another email to O'Neill complaining about disparate treatment. O'Neill tells Mendenhall, a senior vice president for HR, that Dr. Buckhagen is a, quote, extremely disgruntled employee, end quote, page 299 of the appendix. June 16, the employee sends an email to O'Neill and Mendenhall in which she directly opposes discrimination in the backup plan. She argues the plan was, quote, discriminatory, punitive, and unnecessary. Although there are supposed to be backup plans for everyone on the contract, there are not. June 18, the employee sends another email to Mendenhall copying O'Neill and Perry to file a claim of harassment under the employer's anti-discrimination policies. O'Neill understood that the employee was thus complaining about harassment that violated Civil Rights Acts. So, yes, Your Honor, there were repeated complaints about harassment, but O'Neill, one of the persons involved in the discharge, understood that when Dr. Buckhagen was complaining about harassment, she meant disparate treatment, she meant discrimination. Therefore, by June 18, a month before the employer discharged the employee, the company's top executives and the HR managers knew that she was complaining about discrimination by Dr. Beebe. Immediately on June 23, the employer started building a pretextual case against the employee. She scheduled two meetings with the employee. One on her performance that she says was in the works for some time. It was in the works since June 16. It was in the works since June 16, the same day the employee sent her email accusing the company of discrimination. See pages 306 and 308 of the appendix. June 24, six days after the employee files her formal harassment claims, the company increases the harassment of her. They give her a performance improvement plan, a notice that criticizes the employee for challenging her rating by going to Perry and O'Neill. Jumping ahead very, very quickly about this notice right here. The court below found that in connection with one of the pretextual reasons given by the company, that she needed some kind of reminder the last week of June that she needed permission to take leave. There's nothing in this performance improvement plan, nothing whatsoever to suggest there's anything wrong with her time in attendance, nothing in there that suggests that she needed to get approval for any kind of vacations. In fact, she didn't take any kind of vacations at all. June 25, Beebe starts making issues about the employee's attendance now. She's starting to ratchet up the harassment and the retaliation. July the 20th, the employee presented to Ms. Strickland her most explicit and detailed opposition to age discrimination, orally and in a 12-page document. In this document, as you know, she alleges that Beebe violated ICF's anti-discrimination policies and she points out, quote, I am protected under this clause due to my age, end quote. Within a few hours after this meeting, a few hours after she presents this explicit complaint of age discrimination to Ms. Strickland, Beebe sends her an email threatening her with termination. The next day, July 21st, the employee complains to Strickland about Beebe's email and she says she's continuing her harassment of me. Other people had meetings last week at the client. To my knowledge, there was no request from Beebe that their backups be in attendance. I bring that up because that's one of the pretextual arguments that they raised later on, that she didn't have backups in attendance at a meeting. See page 930 of the appendix. Strickland didn't reply to that email. The employee also forwarded that response to Vice Presidents Perry and Mendenhall because she considered the July 20 email more harassment. This was the employee's last protected activity before her discharge five days later. In sum, when you consider the totality of the employee's conduct through a panoramic lens in accordance with this court's decision in DeMasters, the Carilion Clinic, you should be able to see ever-increasing oppositional activities by the employee from March 26th until merely days before her discharge, and that but for her protected activities, the employer would not have fired her. Indeed, on our first appeal here, this court recognized, quote, the timing of Buckhagen's discharge six days after she made it clear that she was complaining of age discrimination is sufficient to establish causation at this stage of the proceedings. Well, after that point, we got discovery, as we explained in our briefs, that showed quite definitely this was the reason for the termination. It was the retaliation against her for complaining about discrimination. The company comes back with pretextual reasons. The discharge letter has no reasons whatsoever, nothing specific in the discharge letter. Orally, Perry gives her two reasons. One, that she took unauthorized leave on July the 9th. She didn't take her backups to a meeting on the July 14th. The fact of the matter is she took no leave. This argument that she took unauthorized leave on July the 9th, up until June 29th, it was very, very clear the employee could make her own schedule. She had a 34-hour week. She could make her own schedule. All she had to do was simply tell her boss, here's my schedule for the week. Short days, long days, I will work at home, and so on. No problems whatsoever. There's no evidence that anybody else on this contract had any problems taking time off. When she raised the issue about taking time off on the 29th, when she said she'll be out of town on the 9th, not time off, she'll be out of town on the 9th, Dr. Beebe said, no, you need to, this is not an accustomed, this is not, you didn't have permission to do this. And so what she did, she adjusted her schedule. She satisfied Dr. Beebe's concerns, and she didn't take any time off that week, the last week of June. And according to what Dr. Beebe said and Ms. O'Neill, it was resolved satisfactorily. And Dr. Beebe said, thank you, signifying it was okay. And as far as the July 9th thing, it was very, very clear. No one told Dr. Buckhagen, you can't take off on July the 9th. But after she complains on July the 20th, it becomes an issue. Now it becomes an issue on July the 20th in Dr. Beebe's e-mail that she sent hours after she complained to Ms. Strickland about the age discrimination against her by Dr. Beebe. For these reasons and those set forth in our briefs, we ask the Court to reverse the district court and remand for a trial. Thank you. Thank you, sir. Mr. Dutra. Thank you. Good morning, Your Honors. May it please the Court. Jeremy Dutra on behalf of the appellees, ICF and ICETEC, with the firm Squire Patent Boggs. I want to just address a couple of points that opposing counsel raised here about it was Mr. Perry who hired the plaintiff. That very well may be true. There was also Dr. Beebe who promoted her to manager, which is a senior writer, when she was moving over to ICF because her former manager had gone into the house with a client. And two, Dr. Beebe agreed to the pay raise, a significant pay raise, by over 50%, recognizing, you know, her role and her contributions that it was appropriate. In fact, it was a salary higher than Dr. Beebe, her own supervisors. In terms of ageism, the only evidence in the record of anybody displaying ageism is actually the plaintiff. Where when there was an open house, when ICF took over the contract, she specifically told Mr. Perry, I don't want to work for Ms. Harrison, now Ms. Juth, through marriage. Because I don't think it's right for me to have to report to a younger person, given all of my experience. And the idea that you say that. She said that in, I believe it was September, I don't know the exact date, I think it was September 9th. There was an open house after Lockheed Martin was switching off, where ICF, Mr. Perry went over to Lockheed Martin to speak with the employees and explain the process for applying for the new positions with ICF. But it's in the record that she specifically told Mr. Perry that she did not want to work with, she didn't think it was right for her to work with a younger employee. Didn't like to work for a younger. Right, she didn't want to report to a younger employee. That was Ms. Beebe? That was, no, that was the plaintiff. The plaintiff herself. The plaintiff said that, but who was the younger supervisor? It was Ms. Juth, Mrs. Harrison at the time. She's the one who actually. What was the age difference? I believe Ms. Juth was either in her 20s or 30s. She was already preexisting at Lockheed Martin when Dr. Buckhagen, the plaintiff, was hired on. Dr. Beebe, also a member of ProtectICAS, as well as a number of other people on the contract as well. The idea that there's no other employees that had backup plans, that's just simply false. In fact, this wasn't just sort of a targeted effort at Dr. Buckhagen, the plaintiff here. Before ICF received it, there were two individuals working on the glossary. And it was actually the client herself, Dr. Beckwith, who indicated she had some concerns about workload. You know, have one person doing the job of two people. And she had concerns that only one person having knowledge about how something worked was concerning for a major project like this. There had been issues on the glossary previously. And she specifically indicated that she thought it was good practice to actually have backups on all tasks. So the idea that somehow this was targeted towards Dr. Buckhagen is just simply false. It was something that the client specifically asked for and specifically wanted. So after I've addressed that, this is, I think, as the court recognized, this is the second time this has been up here. It was on motion to dismiss the first time where this court affirmed the dismissal of the hostile work environment harassment claim. While this court remanded on the age discrimination retaliation claims, this court did recognize that there were issues with plaintiff's allegations. This court wrote in its opinion that the allegations in Buckhagen's complaint that cut against her claim for relief. This court further observed that Buckhagen's behavior as described in the complaint could be construed as problematic or even insubordinate. The record that developed after remand did not develop in plaintiff's favor here. In fact, when you go through this, the court legitimately found that she was not meeting the reasonable expectations of her employer. And there's really no genuine dispute of fact here. This is all based on contemporaneous notes and communications and emails. It's all documented here. And these communications, they reflect a growing dissatisfaction by plaintiff's supervisor about her behavior and attitude, particularly towards her supervisor. ICF repeatedly counseled plaintiff about improving her attitude and behaving more professionally. In fact, there were conciliation sessions with HR. She responded with resistance, the plaintiff did. They were already concerned about her behavior and her escalation of behavior when they decided to place her on the PIP. And all this occurred before any allegations of age discrimination. And the documented reason, as reflected in the record, and the court recognizes, the documented reason for the termination was insubordination. And the court outlined the reasons why. Going through the record here, the first reason, and this is really the genesis here, that she failed to accept responsibility for the insert of the Spanish hysterectomy image. It was not the reason for the termination, but it really set the stage for all the events that were to occur here. She's a manager now. Plaintiff blamed it on a glitch. It was clearly human error. The client said it was human error. The IT personnel said it was human error. But she wouldn't accept responsibility for it. And Dr. Beebe noted that the fact that her manager wasn't accepting responsibility, was trying to deflect blame on the glitch, which clearly was not, really caused her to lose trust in this manager. And there's no dispute that the handling of this situation of the image uploading had nothing to do with age. But this actually then led to the performance evaluation. And this is really where the disgruntled behavior really took hold. The plaintiff was completely dissatisfied with the ratings she received, with the performance evaluation. Part of it was based on this image issue. And so she repeatedly challenged it. Went to Mr. Perry, went to eventually her supervisor. She was very disgruntled about this. And, in fact, there were two conciliation sessions where HR came in, and the first one on April 27th, the HR manager, Mrs. O'Neill, said, Plaintiff, you are disgruntled towards your supervisor, Dr. Beebe, and you need to let it go. At the second one, she didn't let it go. At the second conciliation session, when her supervisor, Dr. Beebe, is instructing her as to the process of communicating with the client, her response was to tell her supervisor, that is ridiculous. You don't speak to your supervisor like that. When your supervisor is giving you instructions, you don't respond with telling your supervisor that she's being ridiculous. She didn't respect the authority of her supervisor. And, as noted, the client wanted a backup plan. And Dr. Beebe reached back out to the client to find out how things were going. The client, again, reiterated, I don't believe any one person should be the only one to know how to do this. What happens if the plaintiff, Dr. Buckhagen, gets sick? Nobody else would know what to do. I think it's good practice to have backups. That's precisely what Dr. Beebe did. She put together a process plan of here's who are going to be the backups, who are going to train, there are going to be copies, so they understand what's going on in the process flow. They presented it to a plaintiff on June 2nd. She questioned it. She questioned the process plan. She challenged the qualifications of the backups and the personnel that were chosen by her supervisor. She didn't want to accept this. She also said she did, but she clearly bristled at this idea. And this actually then led to the further escalation of the situation by plaintiff. She wasn't content with just expressing this pleasure with HR and with her supervisor. She now brought the client into it, trying to drive a wedge between the client and her supervisor. And this really was the June 3rd email that plaintiff sent to Dr. Buckhagen, who was the, I'm sorry, Dr. Beckwith, who is, too many Bs here, Dr. Beckwith, who was the client, where she basically was expressing dissatisfaction with this new internal process. Clearly she was unhappy with it. She was displaying her displeasure to the client. Dr. Beebe was incredulous. And after a second follow-up email from plaintiff to the client, effectively complaining about expanding the list of backups, HR reprimanded her. Ms. Neal said, this is what we've talked about. You need to present a united face to the client. It was unprofessional and inappropriate to bring these types of issues to the client. We handle this in-house. You present a united message to the client. She argues with HR about this. And HR was very specific. You need to follow the instructions of your employer. You don't bring these types of issues in front of the client. What did she do just a few days later? She does it again. HR had already told her. Dr. Beebe had already told her how she was behaving, and she ignored them. She, again, emailed Dr. Beckwith, the client, and raised again this dissatisfaction with the internal process requirements. And it was these email exchanges that really led to the performance improvement plan. The day after she sent that email that was insubordinate to HR's instructions, HR sent the performance improvement plan template to her supervisor. The supervisor, Dr. Beebe, immediately filled it out and outlined why she wasn't meeting the expectations. Part of it had to do with the fact that she was involving the client, and her dissatisfaction with internal reporting requirements. And on June 11th, yes, HR noted that she's extremely disgruntled. She's ignoring instructions and warnings from HR and her supervisor and noted that her manager and the VP, Mr. Perry, they're just fed up of dealing with this. This is not what supervisors want to be spending their time with, of telling an employee something and having that employee bristle and fight back and challenge not only internally but also with the client. So the plaintiff ultimately was placed on a PIP on June 24th. And the plaintiff acknowledges that she was told during that meeting that she was acting insubordinately. She was insubordinate to her supervisor. And that the instruction was a very broad instruction and frankly probably shouldn't have had to be given to anybody. You have to immediately implement the decisions of your supervisor when she gives you instructions. It seems it goes without saying, but they had to put it into a performance improvement plan and they directed her that this is what you must do. You must follow your supervisor's instructions immediately. What does she do? The next day, as the court noted, she immediately violated the PIP. She attempted to take unapproved leave. She just emailed the client saying, I'm not going to be in town next week and my backup's not going to be in town. She didn't get approval. And when Dr. Beebe called her on this, she responded to her supervisor with sarcasm. And eventually it got resolved, but as HR noted, it was very surprising that we even had to have this type of situation just a single day after having this meeting about her insubordination and not follow the instructions of her supervisor. So even though she has now been told that you must not tell the client you're taking leave without having approval from your supervisor, what does she do less than two weeks later? She does the same thing. She sends another email to the client saying, I'm going to be gone on July 9th. She didn't have approval in advance from her supervisor. She didn't ask for it in advance. Again, the PIP told her you must follow the instructions. Her supervisor told her your instructions are you must obtain advanced approval from me before announcing you're going to take leave. She didn't do that. And she also failed to inform Dr. Beebe, her supervisor, about the client meeting. This had nothing to do with she didn't take her backups or whatnot. This had to do very specifically with an issue that predated the PIP. During one of the conciliation meetings in April of 2010, Dr. Beebe made it very clear that Dr. Buckhagen was supposed to inform her supervisor, Dr. Beebe, of all upcoming meetings with the client. Dr. Buckhagen, the plaintiff, she wrote this down in her own hand. This was the instructions of her employer back in April. And what does she do? She fails to inform Dr. Beebe of an upcoming meeting on July 14th. Now, the July 20th email was, let me sit back here, that that same day on July 14th when HR found out what had occurred, they clearly stated that she was not complying with a performance improvement plan. She was not complying with her supervisor's instructions. And Dr. Beebe wrote an email. This was on July 16th where she wrote the email. Now, it wasn't approved by Ms. O'Neill until July 20th, but the text of the email was drafted on the 16th. And here Dr. Beebe, the supervisor, explained, you were reminded on the 25th of June you must request a vacation and approval for time off. And go ahead and notify the client about your absence without requesting the approval. You have violated my instructions, and you failed to inform me in advance of the meeting with the client, even though I had instructed you to do so. And as Dr. Beebe correctly noted, these incidents indicate, quote, your continuing unwillingness to accept my authority. And how does plaintiff respond? She's defiant, openly defiant towards her supervisor, explaining why her supervisor is wrong, why her supervisor should have figured this out on her own. And, in fact, we couldn't so far as to deny she was even on a performance improvement plan. It was just incredulous. She had just had a meeting where she countersigned the performance improvement plan, indicating that one of her specific instructions was she must follow her supervisor's instructions. And this really was when Dr. Beebe received this response. She forwarded it internally, and this really was finally the end of the line. I mean, they were finished. She was already told that if her behavior continued, she was going to be terminated. And the very behavior that resulted in her being placed on a performance improvement plan is specifically what led to her termination. And as the courts have recognized, legitimate non-retaliatory reasons for termination include failure to meet performance expectations, taking leave without permission, conduct that's disruptive, rude, or sarcastic, and insubordination. We have all of those here. The undisputed record reflects this. This isn't a characterization. These are the actual words contemporaneously drafted by the plaintiff herself and in e-mails. Whether it was a wise decision or a fair decision, that's not the ultimate question here. Was it a legitimate reason? And the record plainly demonstrates that it was. And the terms of the termination letter, no pretext here, it was consistent. The termination letter noted that there had been a PIP place because of unacceptable behavior since March 17th, that the unacceptable behavior was discussed at the PIP meeting on June 24th, and that the unacceptable behavior continued. I'll also note, too, Your Honor, as I see my time is counting down here, this case on appeal is only on the retaliation claim. There was no appeal of the age discrimination claim. And the court did, the district court clearly addressed both of them. And the non-appeal decision of the age discrimination we view is significant here because the age discrimination claim required plaintiff to prove she was meeting her employer's legitimate expectations at the time of adverse action. And the court specifically found she was not. She was insubordinate and outlined the reasons for her insubordination. And the court also found that the reasons that were given for the termination were not pretextual, that she had not established that it had been a pretext. So the failure to appeal that claim, she effectively, it's now effectively the law of the case here that she was not meeting expectations, legitimate expectations, and there was no pretext. And it is significant here because there is an analytical overlap here where the termination decision, where she said the termination, the plaintiff claims termination was based on both age discrimination as well as retaliation for complaining about age discrimination. So it collapses down, and both of them follow a common analytical framework as the court has recognized. You have to prove that discrimination or retaliation was the but-for cause, the real reason for the adverse action. And you also, the employee has a burden of proof pretext that the proffered reason, the legitimate reason, was not legitimate, that it was actually false, and that discrimination was the actual reason or that retaliation was the actual reason. Here, as I outlined, it's insubordination. The court found it. The district court found it. The record is clear. This court, when it remanded, expressed skepticism just given that a number of her own allegations or complaint displayed some level of insubordination. So our view is that the judgment of no age discrimination further disposes of retaliation claims since they both require the same proof that she has to demonstrate that the legitimate reasons for firing were pretextual, which she has not done. Now, I'll just conclude by saying, Your Honor, that unfortunately this, and I think the district court was right on this, that this is an unfortunate example of an employee who came to believe that she was indispensable. And her arguments are really trying to turn the ADEA on its head, where she's arguing her age and experience that somehow gives her license to do what she wants, work on her own, not have to follow the instructions of her supervisor. That is clearly incorrect. And the employer here, ICF, displayed a lot of restraint. They tried to work with her, and she became more and more disruptive, and she couldn't ever let it go. And it became a time drain. It's in the record, and ICF was just tired of having to deal with this. She was not performing the way she was instructed to. She was violating her performance plan. She was disobeying the instructions of her supervisor. She was clearly insubordinate. The record fully reflects that. And so, Your Honors, we respectfully request that this court affirm the district court's judgment in its entirety. If you have any more questions. Thank you very much. Thank you. Mr. Vanoff, you've got some rebuttal time. Yes, Your Honor. This was not a case for summary judgment. If you have any doubt about how there were conflicting facts, look at the nice exhibit, 97, that the appellees gave to the district court, pages 1042 and 1043. This shows the competing evidence on the July 14 meeting, complete with record references. Thank you very much. As far as, there's no evidence in the record to show that Dr. Beebe actually determined the employee's pay at ICF. At page 5 of the appellee's brief, they referred to Appendix 20. That's our complaint. In our complaint, we simply said, Dr. Beebe thought it would be reasonable for Dr. Buckhagen to ask for $60 an hour. She said she would work on it. But there's zero evidence in the record to show that she had anything to do with the actual decision on what to pay her. She wasn't even employed by ICF at that time. She was still employed by Lockheed Martin. Let me read you something else. The employer tells you that after the employee was given this notice, that she violated the notice by interfering with the client. Here's what she said. This is page 18 of the brief. Per the policy that has just been set in place as a result of the meeting that you and Lakshmi recently had with Debbie, Debbie Beebe, to address your concerns about the glossary and multimedia, I am ceasing Debbie. Mary Barnes said those are the backups regarding glossary and media. She's informing Dr. Beckwith, the client, why she's suddenly doing this. Dr. Beckwith says, I didn't see any need to copy all those people. I don't know why you have to copy all those people. Furthermore, there's no record in the evidence to show that Dr. Beckwith was the one who established the backup plan. The record shows clearly that Dr. Beebe brought it up to Dr. Beckwith, and Dr. Beckwith said, well, I thought everybody should have them. But the record is very clear that it was Beebe's idea. The record references for that are, if you'll please look at Beckwith deposition pages 44 and 45 in Plaintiffs' Exhibit 13 and Appendix 693. It's very, very clear from the record that the employee did follow the plan. By the very next day, she sent that email to Dr. Beckwith, and she copied Dr. Beebe and her backups. The notes that he was referring to were internal notes, and some of those internal notes I've quoted from, they called her disgruntled. They said there was a mutiny. Those notes show that they were definitely antagonistic towards her because she was complaining about discrimination on the job. The employer's basic position is, please accept it when we discriminate against you and don't complain about it. That's the thrust of their action against her. For these reasons, the notes head forth in our brief. We ask the court to reverse the district court. I trust you'll read over the brief very carefully and see how there are definitely conflicting facts here. This is not a case for a court to say it was wrong for Dr. Buckingham to do what she did. This is not a case for a district court to say the employer is right because there are so many conflicting facts. There's so many conflicting evidence about every aspect of this case. Thank you very much. Thank you very much, sir.
judges: Robert B. King, G. Steven Agee, Henry F. Floyd